IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 09-CR-30021 |
| ) | |
| STEVEN JACKSON-BEY, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant Steven Jackson-Bey's Motion to Suppress Evidence (d/e 15) (Motion to Suppress). The motion is fully briefed, and pursuant to Local Rule 72.1, the District Judge has referred the matter to me for an evidentiary hearing and Report and Recommendation. See Text Order, dated December 16, 2009. After carefully considering the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion to Suppress be DENIED.

### I. BACKGROUND[1]

Defendant Steven Jackson-Bey is charged in a one-count Indictment (d/e 6) with possession with intent to distribute at least five grams of cocaine

---

[1] This Report and Recommendation is prepared without the benefit of a transcript.

base (crack) in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1).  The case arises out of a traffic stop which occurred January 3, 2009 on Interstate 72 in Pike County, Illinois.  Based upon the testimony heard in open court, Brian Martin, an officer with the Quincy (Illinois) Police Department (QPD) assigned to the West Central Illinois Drug Task Force, received a telephone call from a confidential source at approximately 10:07 p.m. on January 2, 2009, regarding the Defendant.  The confidential source, identified at the hearing as Steven Jones, informed Martin that Jackson-Bey and Elizabeth Chontal would be traveling to Quincy in Chontal's red minivan with crack cocaine that night.  Jones reported that Defendant had not answered his cell phone, and in the past, when Defendant was traveling and shut off his cell phone, it indicated that he was traveling with narcotics.

  Martin knew Chontal, was familiar with the red minivan, and knew the van's license plate information.  After talking to Jones, Martin called dispatch with the license plate information and learned that the red minivan was a Plymouth and was registered to Gregory Meyer, Chontal's father.  Martin contacted Inspector Lee Mangold of the QPD after the phone call, because he knew that Mangold had a previous investigation regarding the Defendant.  Martin then contacted the Illinois State Police (ISP) and passed on the information regarding the possibility

of narcotics trafficking. Martin did not identify Jones to the ISP either by name or by confidential source identification number.

Martin had no personal experience with Jones prior to receiving the January 2nd telephone call. He did know that Jones had done work with the Drug Enforcement Administration (DEA) and with Mangold. Mangold testified that he became familiar with Jones in September 2008, while Jones was incarcerated. Jones agreed to participate in a controlled cocaine purchase from Kevin Vance. Jones, who remained in custody during his cooperation, set up a transaction with Vance which involved 4.5 ounces of crack cocaine. Vance was arrested, and law enforcement official seized 4.5 ounces of crack from Vance's girlfriend. Martin testified that he was aware of Jones' participation in the Vance transaction at the time he received Jones' call on January 2, 2009. Both Martin and Mangold testified that they would not consider Jones truthful today, based on events that transpired after January 3, 2009, but that they considered him to be a reliable informant at the time of the call.

Pike County Deputy Sheriff Curt Williams testified that he was on duty the evening of January 2 and early morning of January 3, 2009. Williams testified that he received information from the ISP that two individuals, a black male and a white female, would be traveling on I-72 in Pike County that night in a red Plymouth minivan and were possibly transporting crack cocaine. Williams was given the license plate information for the minivan and was told that the minivan

would be going to a residence in Quincy, Illinois and would be returning from Chicago or Alton, Illinois. Williams testified that he received the call to look for the minivan at approximately 11:00 p.m. Williams positioned his squad car on I-72 at milepost 36 in a turnaround to look for the minivan. Williams ran radar on all of the vehicles that passed him. Eventually, he saw two vehicles approach in tandem. The lead vehicle was a Cadillac and the other was a red minivan. Williams clocked the vehicles as traveling 71 miles per hour on radar. Both vehicles slowed to less than 60 miles per hour as they approached Williams' squad car, despite the fact that the speed limit was 65 mph. After the vehicles passed, Williams pulled out onto I-72 behind the vehicles, keeping them in sight. Williams was in communication with other officers. They formulated a plan that Williams would initiate a traffic stop after passing milepost 21, where another officer was located.

    As Williams followed the minivan, he observed a cigarette butt thrown out the window and the glow of sparks as it hit the pavement. Williams also noticed that the minivan had a cracked taillight because he could see white light shining through a part of the red. Williams manually initiated his in-squad video camera while he was following the minivan. A DVD of the recording was admitted as Government's Exhibit 1. The Court viewed the DVD and took particular note of the timing of the recorded events as detailed below.

The minivan indicated that it was exiting I-72 at Exit 20, which is the Barry, Illinois exit. Williams initiated a traffic stop of the minivan at this point and confirmed its registration. Williams followed the minivan for approximately a quarter of a mile at which point the minivan stopped and Williams called in his location to dispatch. The time counter on the DVD player indicates that the minivan stopped along the side of the road approximately 6 minutes and 48 seconds after the beginning of the recording. Deputy Jordan Gerard joined Williams at the stop. Williams approached the minivan on the driver's side and made contact with the driver, who he identified at the hearing as Defendant Jackson-Bey. The time counter on the DVD indicates that Williams made contact with the driver approximately 7 minutes and 14 seconds after the beginning of the recording. Gerard approached the passenger side of the minivan and made contact with passenger Chontal. Williams asked Jackson-Bey for his driver's license and insurance information, while Gerard retrieved Chontal's information and passed it along to Williams. Williams returned to his squad car to check all of the information with dispatch. The time counter on the DVD indicates that Williams returned to his car approximately 9 minutes and 22 seconds after the beginning of the recording.

While Williams was in the squad car waiting for a return from dispatch, Gerard conducted a canine sniff of the minivan, with his trained narcotics dog,

Mocca.[2]  Williams estimated that this occurred two to three minutes after the traffic stop was initiated, while Gerard estimated that it was approximately a minute and a half after the stop.  The time counter on the DVD reveals that the canine began walking around the minivan approximately 9 minutes and 54 seconds after the beginning of the recording.  Deputy Gerard testified that Mocca alerted on the passenger door of the minivan.  According to Gerard, Mocca alerts by scratching at an odor.  After the alert, Gerard returned Mocca to his squad car and informed Williams that the canine had alerted.

    The deputies returned to the minivan, informed Jackson-Bey of the alert, and asked both Jackson-Bey and Chontal to exit the vehicle.  The time counter on the DVD reveals Jackson-Bey exiting the minivan approximately 13 minutes and 36 seconds after the beginning of the recording.  Jackson-Bey stated that he had smoked cannabis in the minivan earlier in the day and stated that the officers could search the vehicle.  The time counter on the DVD reveals that this admission occurred approximately 14 minutes and 13 seconds after the beginning of the recording.  Williams conducted a pat down search of Jackson-Bey for weapons and instructed Jackson-Bey to stand over to the side of the road for safety.  Jackson-Bey requested his coat.  Williams retrieved the coat from the minivan and searched it for weapons or contraband.  Finding none,

---

[2] At the time of the stop, Gerard had been a canine officer for approximately six months and had conducted approximately six prior work-related searches.

Williams gave the coat to Jackson-Bey.  As this was transpiring, Williams noted the odor of cannabis on the coat.  Both Williams and Gerard noted that Jackson-Bey's eyes appeared bloodshot.  Williams described Jackson-Bey as cooperative but a little agitated.

Gerard asked Chontal to step out of the minivan.  As she did, Gerard noticed that the zipper on her pants was down.  Gerard questioned Chontal about this and she replied that her zipper was broken.  Gerard asked Chontal if she had any narcotics on her person; she responded that she did not.  Gerard characterized Chontal as nervous and fidgeting.  Gerard placed Chontal in his squad car.

Williams and Gerard began to search the minivan.  Williams searched the driver's side, while Gerard began to search the front seat passenger area.  Williams testified that Gerard was called away from the stop at which point Williams went to search the passenger side and found a digital scale under the passenger seat.  According to Williams, he discovered the scale fairly quickly, within eight to ten minutes of the beginning of the stop.  Gerard testified that Williams found the scale prior to Gerard's departure from the scene.  Chontal was removed from Gerard's squad car prior to his departure, and she remained on the scene in Williams' squad car.

Williams testified that he removed the scale from the minivan and went to talk to Jackson-Bey. Jackson-Bey informed Williams that the scale was a gift and was not illegal. Williams then resumed searching the minivan. He discovered a box of sandwich baggies on the floorboard in the middle of the van. There were also several other items in the van, including clothing, household items, automotive items, and children's items. Williams handcuffed Jackson-Bey after Williams discovered the sandwich baggies for officer safety reasons because he noticed that Jackson-Bey had become more agitated. The time counter on the DVD reveals that Williams began handcuffing Jackson-Bey approximately 24 minutes and 40 seconds after the beginning of the recording and that it took about a minute to secure Jackson-Bey in double handcuffs. According to Williams, Jackson-Bey became less agitated after he was handcuffed. Williams resumed searching the minivan and eventually informed Jackson-Bey that he was under arrest for driving under the influence of narcotics. The time counter on the DVD reveals that Williams made this statement approximately 42 minutes and 35 seconds after the beginning of the recording. On cross-examination, Williams testified that he based the DUI arrest on Jackson-Bey's admitted use of marijuana and his bloodshot eyes. Williams testified that he did not observe any swerving while following the red minivan and that he did not administer any field sobriety tests. Williams testified that he

observed at least three traffic violations prior to stopping the minivan, but none of those related to the DUI.

After telling Jackson-Bey that he was under arrest, Williams again resumed his search of the minivan. Gerard returned to the scene and a couple of ISP troopers arrived. The time counter on the DVD reveals other officers on the scene approximately 49 minutes and 57 seconds after the beginning of the recording. Williams asked Gerard to place Chontal back in Gerard's squad car, and Gerard did so, placing Chontal in the front seat. The search of the van revealed no contraband.

Williams left the scene with Jackson-Bey. The time counter on the DVD reveals that this occurred approximately 1 hour 7 minutes and 24 seconds after the beginning of the recording. Williams estimated that the traffic stop began at approximately 12:49 a.m. and he began transporting Jackson-Bey to the Pike County Jail at approximately 1:51 a.m. Williams read Jackson-Bey the Illinois Warning to Motorist form, advising him of his rights relative to the DUI arrest, and asked him to provide a blood or urine sample. Jackson-Bey declined to do so. Williams issued Jackson-Bey a citation for driving under the influence in violation of 625 ILCS 5/11-501(a)(4).[3] Government's Ex. 2. Williams also issued

---

[3] Under 625 ILCS 5/11-501(a)(4), it is illegal for a person to drive while "under the influence of any other drug or combination of drugs to a degree that renders the person incapable of safely driving." Under 625 ILCS 5/11-501(a)(6), it is illegal for a person to drive while "there is any amount of a drug, substance, or compound in the person's breath, blood, or urine resulting from the unlawful use or consumption of cannabis listed in the Cannabis Control Act . . . ."

Jackson-Bey a warning citation for speeding, a cracked taillight, and littering. Id.

Gerard and Chontal remained on scene, waiting for a tow truck to tow the minivan. According to Williams, it was department policy to have the vehicle towed by a towing company and placed on a twelve-hour hold. The tow truck arrived at approximately 2:07 a.m. Gerard then transported Chontal to the Pike County Sheriff's Office so she could arrange for a ride to pick her up. Chontal told Gerard that she was sixteen weeks pregnant and was experiencing cramps; however, she declined Gerard's offer to call an ambulance. Gerard testified that Chontal was never under arrest; however, he does not recall telling Chontal that she was free to leave. While they were en route to the Pike County Sheriff's Office, Chontal asked Gerard what would happen if she had something illegal on her person. Gerard informed her that it would be best for her to tell if this was the case. Chontal then said that she had crack cocaine and other pills in her pants. On cross-examination, Gerard testified that Mocca did not alert to Chontal while she and the dog were both in Gerard's squad car. Gerard explained that he did not ask the dog to search Chontal and that policy prohibited the use of a canine to search a person.

When they arrived at the Sheriff's Office at approximately 2:20 a.m., Chontal pulled items out of her pants and handed them to Gerard. Gerard testified that Chontal handed him $500.00 worth of crack cocaine, some cannabis, and four prescription pills. Gerard subsequently learned from other

officers that, after being informed that the police had recovered the drugs, Defendant stated that the drugs were his and that he had asked Chontal to hold them when the stop occurred. Jackson-Bey was subsequently charged in the instant case.

## II. ANALYSIS AND CONCLUSIONS OF LAW

Jackson-Bey filed the pending Motion to Suppress, asking the Court to suppress all statements made by Jackson-Bey, all drug paraphernalia recovered from the minivan, and all controlled substances recovered from Chontal, based on the argument that this evidence was recovered in violation of the Fourth Amendment. Specifically, Jackson-Bey contends that the automobile stop constituted an illegal seizure and that the evidence outlined above should be suppressed because it was derived from the illegal seizure.

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A defendant seeking to suppress evidence because of a violation of the Fourth Amendment must first establish that he has standing to challenge the search or seizure in question. United States v. Sweeney, 688 F.2d 1131, 1143 (7th Cir. 1982). Once the defendant has established standing in a case in which law enforcement officers conducted a warrantless search, the burden of proof shifts to the government, because warrantless searches are "per se unreasonable under the

Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). At that point, the Government bears the burden of establishing by a preponderance of the evidence that an exception to the warrant requirement applies. United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000).

The Court turns first to the question of standing. The record clearly establishes that Jackson-Bey has standing to challenge the admissiblity of his statements to law enforcement officials and the drug paraphernalia recovered from the minivan. The Government argues that Jackson-Bey lacks standing to challenge the seizure of drugs from Chontal. It is well-established that "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" United States v. Figueroa-Espana, 511 F.3d 696, 703 (7th Cir. 2007) (quoting United States v. Jackson, 189 F.3d 502, 507 (7th Cir. 1999)). Jackson-Bey recognizes this general principle, but argues that he has standing to challenge the seizure of narcotics because it flowed from the allegedly unconstitutional automobile stop and subsequent detention and thus constitutes fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963).

As his argument is framed, the Court believes that Jackson-Bey has standing to challenge the admissiblity of the controlled substances recovered from Chontal as fruit of the allegedly unlawful automobile stop and subsequent

detention.  The exclusionary rule prevents the use of evidence obtained in violation of the Constitution, including the indirect as well as the direct products of the unconstitutional conduct.  <u>United States v. Robeles-Ortega</u>, 348 F.3d 679, 681 (7th Cir. 2003) (internal quotations and citations omitted).  Courts have recognized that the exclusionary rule can extend to evidence derived from third parties.  See e.g. <u>United States v. Meece</u>, 580 F.3d 616, 619-20 (7th Cir. 2009) (recognizing the possibility that the fruit of the poisonous tree doctrine could extend to taint consent to search given by defendant's girlfriend following defendant's allegedly unlawful arrest ); <u>United States v. Dallas</u>, 672 F.Supp. 362, 366 (S.D. Ind. 1987) (recognizing the possibility that the fruit of the poisonous tree doctrine could extend to statements made by a third party, but rejecting request to suppress as factually undeveloped).  Jackson-Bey's argument is that the unlawful stop and detention tainted Chontal's disclosure of the drugs.  Thus, Jackson-Bey challenges the admissiblity of evidence that was derived from an alleged violation of his own Constitutional rights; he is not attempting to vicariously assert Chontal's rights.  The cases upon which the Government relies are distinguishable on this basis.  Thus, the burden of proof shifts to the Government.

   The Government bears the burden of establishing by a preponderance of the evidence that an exception to the warrant requirement applies under the facts of the instant case.  When police officers stop an automobile and detain the

occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment and must be reasonable.  See Whren v. United States, 517 U.S. 806, 809-10 (1996).  Jackson-Bey argues that the stop in the instant case was not supported by probable cause.  The record evidence belies this argument and supports a finding that this case involved a valid traffic stop, supported by probable cause, as set forth below.

Williams testified that, prior to initiating the traffic stop, he observed Jackson-Bey commit three violations of Illinois law, speeding, littering, and operating a vehicle with a cracked taillight.  Where an officer reasonably believes that a driver has committed even a minor traffic offense, probable cause supports a traffic stop.  United States v. Cashman, 216 F.3d 582, 586 (7th Cir. 2000).  Although Jackson-Bey argues that Williams could not have detected the claimed traffic violations, there is no evidence to contradict Williams' testimony, and the Court found Williams to be a particularly credible witness.  Jackson-Bey argues that the DVD, Government's Ex. 1, does not show the cracked taillight; however, given the quality of the video together with Williams' description that he believed there was a crack because he saw white light coming through, the DVD is inconclusive on this point.  Jackson-Bey contends that the littering is not visible on the DVD; however, Williams testified that he manually initiated his video camera after the littering occurred.  With respect to the speeding, Jackson-Bey argues that "[w]hile it is possible Defendant may have been driving a few miles

per hour above the speed limit, this was never mentioned to Defendant during the traffic stop. These alleged traffic violations were merely a pretext for stopping Defendant to search for drugs." Memorandum in Support of Defendant's Motion to Suppress (d/e 16), p. 8. There is nothing to discredit Williams' testimony that the minivan was traveling in excess of the speed limit. Furthermore, it is well-established that an officer's subjective motivation is irrelevant, where, as here there is probable cause to justify the seizure. See Whren, 517 U.S. at 812-13. The initial stop of the minivan was not unconstitutional.[4]

Jackson-Bey asserts that the duration of the stop was unreasonable. Jackson-Bey couches this argument in terms of Terry v. Ohio; however, Terry becomes irrelevant given the probable cause traffic stop that occurred in the instant case. Terry, 392 U.S. 1(1968). The Court notes that a seizure that is justified solely by the need to issue a traffic ticket "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). "However, information lawfully obtained during that period may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable

---

[4] See Government's Motion to Supplement Response to Defendant's Motion to Suppress Evidence (d/e 26) citing United States v. Jermario Taylor, No. 08-3648, 2010 WL 522831 (7th Cir., 2/16/10) that an officer's ulterior motive will not invalidate a valid traffic stop.

investigation." Figueroa-Espana, 511 F.3d at 702 (citing United States v. Martin, 422 F.3d 597, 602 (7th Cir. 2005); United States v. Muriel, 418 F.3d 720, 725 (7th Cir. 2005)).  A canine sniff of the exterior of a vehicle for narcotics does not implicate Fourth Amendment concerns, providing that the individual is lawfully detained at the time of the sniff.  Caballes, 543 U.S. at 409; see also United States v. Johnson, 2008 WL 187559, at *4 (C.D. Ill. January 18, 2008) ("Adding a dog sniff of the exterior of a vehicle to a lawful traffic stop executed in a reasonable manner does not violate the Fourth Amendment.").  Additionally, information lawfully obtained while investigating the traffic offense "may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation."  Martin, 422 F.3d at 602.

   The instant case is similar to United States v. Carpenter, which involved a dog sniff arising out of a situation in which one officer was giving the defendant a ticket for evading a red light, while another officer arrived on scene with a drug-detection dog.  Carpenter, 406 F.3d 915 (7th Cir. 2005).  The Carpenter Court held that a modest incremental delay of a person already lawfully detained could not be deemed unreasonable.  Id. at 916-17.  In the instant case, Deputy Gerard and his canine arrived on the scene immediately after the minivan was stopped.  Deputy Gerard began the dog sniff a mere thirty seconds after Williams returned to his squad car to call the identification information into dispatch and

only three minutes after the minivan stopped at the side of the road.  The sniff itself was conducted quickly and was completed before Williams had received a return from dispatch.  The canine sniff did not prolong the traffic stop, but was lawfully conducted during the course of the stop.

After the dog alerted, law enforcement officials had probable cause to search the minivan and to detain its occupants.  The totality of the circumstances, including the information from Jones and the canine alert, indicated a fair probability that illegal drugs would be found in the vehicle.  See United States v. Clinton, 591 F.3d 968, 971 (7th Cir. 2010); see also Illinois v. Gates, 462 U.S. 213, 238 (1983) (holding that probable cause exists if, given the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place").  Defendant challenges Jones' reliability.  However, at the time of the search, law enforcement officials believed Jones to be truthful and reliable, and this belief was reasonable based on Jones' past cooperation.  Furthermore, once a trained dog alerts on a vehicle, officers have probable cause to believe that the vehicle contains contraband. United States v. Ganser, 315 F.3d 839, 844 (7th Cir. 2003).  Thus, the alert standing alone justified the search of the minivan.  Furthermore, it was permissible for the officers to direct Jackson-Bey and Chontal to exit the vehicle. See Maryland v. Wilson, 519 U.S. 408, 414-15 (1997).  At the time he exited the vehicle, after being informed of the canine alert, Jackson-Bey admitted to

smoking cannabis earlier in the day. This admission, together with Defendant's bloodshot eyes and the smell of marijuana on his coat, provided probable cause to support a finding that he was driving in violation of 625 ILCS 5/11-501(a).

Additionally, as he was exiting the minivan, Jackson-Bey consented to a search of the vehicle. This consent occurred within seven minutes after the time Deputy Williams initially made contact with Jackson-Bey and only minutes after Williams had completed his identification check through dispatch. There is nothing to indicate that this consent was not freely and voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) (holding that the determination of the voluntariness of consent is determined from the totality of the circumstances); United States v. Santiago, 428 F.3d 699, 704-05 (7th Cir. 2005) (identifying the following factors relevant to the voluntariness inquiry: (1) the person's age, intelligence, and education; (2) whether the individual was advised of his constitutional rights; (3) how long the individual was detained before he gave his consent; (4) whether consent was immediate or prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when consent was given).

The subsequent search of the minivan was reasonable in both scope and duration. Potential drug paraphernalia was discovered early in the search. The vehicle was a minivan and by all accounts contained a number of items. The search was conducted, for the most part, by one officer. While Jackson-Bey was

forced to stand outside during the search, he was wearing his coat. Chontal was seated inside one squad car or another for the majority of the time the search was taking place. The record evidence supports a finding that Chontal voluntarily turned the drugs on her person over to Deputy Gerard. Chontal was not under arrest. She was transported from the scene of the traffic stop to the Pike County Sheriff's Office in the front seat of the squad car. She was transported from the scene for the purpose of obtaining a ride. There is no evidence of any illegal taint on Chontal's voluntary disclosure. See Brown v. Illinois, 422 U.S. 590, 603-04 (1975).

Defendant hinges his motion on the argument that the traffic stop was unlawful and unreasonable. However, as set forth above, there was no illegal seizure or search; thus, Jackson-Bey's fruit of the poisonous tree argument necessarily fails. There is no basis to suppress statements made by Jackson-Bey, drug paraphernalia recovered from the minivan, or the controlled substances recovered from Chontal.

### III. CONCLUSION

For all the above reasons, I recommend that Defendant Steven Jackson-Bey's Motion to Suppress Evidence (d/e 15) be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within 14 days after being served with a copy of this Report and Recommendation. See 28

U.S.C. § 636(b)(1).   Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   March 4, 2010

*s/ Byron G. Cudmore*
_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE